UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**05  10498 MLW**

---

JOHN FLYNN, On Behalf of Himself and
All Others Similarly Situated,

Plaintiff,

vs.

VIISAGE TECHNOLOGY, INC.,
BERNARD C. BAILEY, WILLIAM K.
AULET, DENIS K. BERUBE, BUDDY G.
BECK, MARCEL YON, THOMAS J.
REILLY AND CHARLES E. LEVINE,

Defendants.

---

Civil Action No.

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

RECEIPT # _62822_
AMOUNT $ _350.00_
SUMMONS ISSUED ___
LOCAL RULE 4.1 ___
WAIVER FORM _____
MCF ISSUED ___
BY DPTY. CLK. _M.P_
DATE _3/16/05_

MAGISTRATE JUDGE _RBC_

---

Plaintiff alleges the following based upon the investigation of Plaintiff's counsel, which included inspection of United States Securities and Exchange Commission ("SEC") filings by Viisage Technology, Inc. ("Viisage" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and judicial orders relating to the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of purchasers of the Company's publicly traded securities during the period from July 22, 2004 through March 2, 2005 (the "Class Period").

2.      Viisage claims to be a leading provider of advanced technology identity solutions that enable governments, law enforcement agencies and businesses to enhance

security, reduce identity theft, and protect personal privacy. Viisage combines its proprietary biometric and secure credential software with complementary industry standard products to create turnkey solutions for its customers that integrate secure document technologies, image and data capture, relational databases, and multiple biometrics, improving the customer's ability to process and manage identity information.

3.    Viisage's operations began in 1993 and, except for fiscal years 1996 and 2000, incurred losses in each fiscal year. As of June 27, 2004, Viisage had approximately $12.6 million of cash and cash equivalents, and $29.8 million in total debt obligations. As a result, Viisage was in a near constant state of capital deficiency to fund its operations. At the same time, the Company was indebted to two of its directors (or entities controlled by them) for more than $20 million.

4.    During the Class Period, defendants embarked on a plan to falsely portray Viisage as a turn around story in order to complete a public offering to raise funds to pay off the millions of dollars in debts owed to its two directors and transfer that risk to shareholders and, also, further enrich Viisage's insiders through their sales of Viisage stock from their personal holdings.  While defendants falsely portrayed Viisage as a turn around company in the high growth sector of secure identity solutions, the reality was that: (i) Viisage had engaged in improper conduct with respect to a $20 million contract with the State of Georgia's Department of Motor Vehicle Safety ("Georgia DMVS");  (ii) Viisage had improperly inflated its reported revenues in the third and fourth quarters 2004; and (iii) Viisage's internal accounting controls were so flawed that they qualified as a having "material weakness" under Public Company Accounting Oversight Board's Accounting Standard No. 2 and, as such, violated the provisions Sarbanes-Oxley relating to the Company's ability to file accurate financial statements.

5.    Defendants' misrepresentations and omissions described herein sent the Company's stock soaring to $9.64 per share on December 23, 2004, from $6.95 per share on July 22, 2004, or a 38.7% increase in just six months.  As discussed in detail below,

2

after the revelations of defendants' fraud, Viisage currently trades at less than $4.15 per share.

## JURISDICTION AND VENUE

6.    The claims asserted arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder.

7.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of the 1934 Act, 15 U.S.C. § 78aa.

8.    Venue is proper in this District pursuant to the provisions of §27 of the 1934 Act. The Company has its principal place of business at 296 Concord Road, Third Floor, Billerica, MA 01821 and many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of false and misleading information occurred in this District.

9.    In connection with the acts, conduct and other wrongs complained of herein, the defendants used the means and instrumentalities of interstate commerce.

## THE PARTIES

10.    Plaintiff John Flynn purchased the Company's publicly traded securities as detailed in the attached Certification and was damaged thereby.

11.    Defendant Viisage is a provider of identity solutions that enable governments, law enforcement agencies and businesses to enhance security, reduce identity theft, and protect personal privacy in the business of designing, developing and marketing educational products, including hardware and software. Viisage is a publicly traded company whose common stock is traded on the NASDAQ National Market System under the ticker "VISG".

12.    Defendant Bernard C. Bailey ("Bailey"), at all relevant times, served as President and Chief Executive Officer of Viisage. Bailey joined Viisage in August 2002 as Chief Executive Officer and was appointed a Director of Viisage in April 2004. Bailey signed Viisage's 10Qs for its quarters ended June 27, 2004 and September 26,

2004, and Viisage's Registration Statement for its secondary offering of 7.5 million shares of common stock, filed with the SEC on July 22, 2004.

13.    Defendant William K. Aulet ("Aulet"), at all relevant times, has served as the Chief Financial Officer of Viisage. Aulet joined Viisage in February 2003 as Chief Financial Officer. Aulet signed Viisage's 10Qs for its quarters ended June 27, 2004 and September 26, 2004, and Viisage's Registration Statement for its secondary offering of 7.5 million shares of common stock, filed with the SEC on July 22, 2004.

14.    Defendant Denis K. Berube ("Berube"), at all relevant times, has served as Chairman of the Board of Viisage, and has served in that capacity since the Company's incorporation in 1996. Mr. Berube is Executive Vice President and Chief Operating Officer of Lau Technologies ("Lau"). Lau is the largest holder of Viisage common stock, directly owning approximately 17% of its issued and outstanding common stock prior to the Class Period and had provided financing to the Company. During the Class Period, Lau sold 352,000 shares of Viisage common on the open market realizing proceeds of $2,889,612.50. In addition, Lau realized proceeds of $779,779.00 from the sale of 141,778 shares of Viisage common stock pursuant to the Registration Statement for Viisage's secondary offering of approximately 7.5 million shares of common stock, filed with the SEC on July 22, 2004, which he signed. Viisage repaid in full its $4.3 million debt obligation to Lau from the proceeds of the secondary offering.

15.    Defendant Marcel Yon ("Yon"), at all relevant times, has served as a Director of Viisage. Yon was CEO of ZN Vision Technologies, a company acquired by Viisage in 2003. Yon is the Chief Executive Officer of Odeon Venture Capital AG, which, prior to the Class Period, owned 949,325 shares of Viisage common stock. Yon has sole voting and dispositive power over the shares beneficially owned by Odeon. During the Class Period, Odeon sold 770,473 shares of Viisage common stock on the open market realizing proceeds of $6,127,489.69. In addition, Odeon realized proceeds of $743,363.50 from the sale of 135,157 shares of Viisage common stock pursuant to the

Registration Statement for Viisage's secondary offering of 7.5 million shares of common stock, filed with the SEC on July 22, 2004, which he signed.

16.    Defendant Buddy G. Beck ("Beck"), at all relevant times, has served as a Director of, and consultant to, Viisage as well as its Vice Chairman of the Viisage's Board of Directors. Beck was the President and Chief Executive Officer of Trans Digital Technologies Corporation from 1998 until its acquisition by Viisage in February2004. In connection with that acquisition, the Company assumed a $15.3 million debt to Beck. Prior to the Class Period, Beck owned 5,869,651 shares, representing 16.4 percent of Viisage's issued and outstanding common stock. During the Class Period, Beck realized proceeds of $779,779 from the sale of 141,778 shares of Viisage common stock pursuant to the Registration Statement for Viisage's secondary offering of 7.5 million shares of common stock, filed with the SEC on July 22, 2004, which he signed. Viisage repaid in full its $15.3 million debt obligation to Beck from the proceeds of the secondary offering.

17.    Defendant Charles A. Levine ("Levine"), at all relevant times, has served as a Director and member of the Audit Committee of the Board, charged with responsibility for overseeing the Company's accounting, financial reporting, data processing, regulatory, and internal control environments. The Audit Committee meets at least quarterly to review the Company's quarterly financial releases. Levine sold 9,000 shares of Viisage common stock during the Class Period and realized proceeds of $63,000. Levine signed Viisage's Registration Statement for its secondary offering of 7.5 million shares of common stock, filed with the SEC on July 22, 2004.

18.    Defendant Thomas J. Reilly ("Reilly"), at all relevant times, has served as a Director and member of the Audit Committee of the Board. Reilly sold 10,000 shares of Viisage common stock during the Class Period and realized proceeds of $8,700. Reilly signed Viisage's Registration Statement for its secondary offering of 7.5 million shares of common stock, filed with the SEC on July 22, 2004.

19.    Each of the defendants named in ¶¶ 12-18 above are collectively referred

to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the Company's publicly traded securities (the "Class") during the Class Period. Excluded from the Class are the defendants herein, the directors, officers, and employees of the Company, the members of each Individual Defendants' immediate families, any entity in which any defendant has a controlling interest, and the legal affiliates, representatives, heirs, controlling persons, successors and predecessors in interest or assigns of any such excluded party.

21.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. During the Class Period, Viisage had outstanding at least 47 million shares of common stock, owned by thousands of persons.

22.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiffs and all of the Class members sustained damages arising out of the same wrongful conduct complained of herein.

23.     Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel who are experienced and competent in class and securities litigation. Plaintiff has no interests that are contrary to or in conflict with the members of the Class Plaintiff seeks to represent.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

25.    Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.    Whether defendants violated the 1934 Act;

b.    Whether defendants omitted and/or misrepresented material facts;

c.    Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.    Whether defendants knew or recklessly disregarded that their statements were false and misleading;

e.    Whether Viisage shares were artificially inflated during the Class Period ; and

f.    Whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

26.    With a planned secondary offering of 7.5 million shares less than three weeks away, on July 21, 2004, Viisage issued a press release relating to litigation over improper bidding practices brought by Viisage's competitor Digimarc Corporation ("Digimarc") relating to a $20 million five year contract awarded to Viisage by the Georgia DMVS in November 2002.  In that press release entitled "Viisage to receive $2.5 million payment; New request for proposals to be issued by Georgia Department of Motor Vehicle Safety", Viisage stated that:

> the Company has taken decisive action to resolve the continuing stalemate over the implementation of the State of Georgia drivers' license contract. Under the terms of the agreement with the Georgia Department of Motor Vehicle Safety (DMVS), Viisage will receive a settlement of $2.5 million as reimbursement for work completed on the drivers' license contract awarded to Viisage in November 2002. This settlement terminates the

current Georgia DMVS contract with Viisage. The agency has confirmed that it intends to file a motion to dismiss the lawsuit initiated by a Viisage competitor contesting the contract award. The Georgia DMVS also has confirmed that it plans to issue a new request for proposals for a new drivers' license system as soon as possible and no later than the end of October 2004.

27.     In addition, defendant Bailey stated in that press release that:

The State of Georgia Department of Motor Vehicle Safety has a responsibility to protect its citizens from identity-related crimes. Recognizing that the State has been unable to fulfill this responsibility for the past year due to the litigation, we chose to take a proactive step to help resolve this issue. Viisage and the State agreed that for the benefit of both our constituents, it was best to terminate our contract, settle final payments and enable the State to issue a request for proposals for a new contract.

This is an amicable agreement with a valued customer on a contract that we believe was appropriately awarded to Viisage. We fully intend to compete for the new contract and are confident that, if re-awarded the contract, our advanced technology identity solutions would successfully fulfill the Georgia DMVS's needs for a state-of-the art solution.

28.     In a conference call with analysts held on July 22, 2004, Defendant Bailey elaborated further on the termination of the Georgia DMVS contract stating:

Viisage was never a party to this lawsuit, which has dragged on and on for a year and a half, nor were any allegations of impropriety ever lodged against our company. Still and all, with more than $1m spent already in legal fees as a related party and no prospect of a breakthrough in the logjam within the foreseeable future, we decided it was time to act.

Let me put this in context. Almost two years ago, when I joined Viisage, I said that we would build this company from the customer end. Central to that was a core value that states that we are committed to the success of our customers. That means making sure that they are successful in all they do, not just implementing on our contracts. As a result, we had to make sure that we lived by our core values. So rather than continue to let the State waste money and continue to deprive their customer of the advantages of Advanced identity Solutions documents, we took action.

We offered an approach that allowed the State to move this procurement from the courts to the marketplace where we believe it belongs. The terms of this settlement are spelled out in the press release we issued. What's most important are two facts. First, this step will enable the State to end the ongoing legal battle with its enormous costs for all parties.

8

Second, the State will be reissuing an RFP for this contract before the end of 2004, allowing its citizens to finally get the secure identity document that they require for their protection.

29.     Defendant Aulet stated further on that conference call that "[t]he cash total will be increased by the payment we are receiving from the State of Georgia of $2.5 million, which will be recorded in the third quarter of this year."

30.     On July 22, 2004, Viisage filed an amended Registration Statement with the SEC with respect to Viisage's secondary offering of at least 7.5 million shares (the "Offering"). In the Registration Statement, defendants again asserted that the Georgia DMVS had "terminated the contract for convenience" and that Viisage would be paid $2.5 million -- $2 million in cash and $500,000 to repurchase certain equipment that Viisage had purchased for Georgia.

31.     On August 5, 2004, Viisage filed a prospectus (the "Prospectus") related to the Offering of approximately 7.5 million shares at $5.50 per share -- at least 300,000 of which were to be sold by certain of the Individual Defendants. In the Prospectus, defendants again falsely asserted that the Georgia DMVS had "terminated the contract for convenience" and that Viisage would be paid $2.5 million -- $2 million in cash and $500,000 to repurchase certain equipment that Viisage had purchased for Georgia. The Prospectus noted that Digimarc had filed a motion with the court in Georgia to enjoin the Georgia DMVS from amking any payments to Viisage under this settlement. The offering raised nearly $38 million for Viisage and approximately $2.3 million for Individual Defendants Berube, Beck, and Yon.

32.     The foregoing statements in ¶¶ 26-31 were knowingly, or recklessly, materially false and misleading because the undisclosed truth was that defendants were attempting to end the litigation to prevent Viisage's improper conduct relating to its bidding for the Georgia DMVS contract from becoming public. In addition, defendants falsely claimed that the canceling of the contract resulted from Georgia's "inability to fulfill" the contract when in fact -- as would later be disclosed -- Viisage's improper

conduct and misrepresentations of its capabilities in the bidding process caused this contract to be terminated. As such, defendants' claim that they were entitled to a settlement of $2.5 million -- $2 million of which related to the work the Company had purportedly performed under the contract -- was also materially false and misleading because Viisage was not entitled the aforementioned $2 million in light of its misconduct and misrepresentations. Lastly, Defendant Bailey's statement in ¶28, that Viisage was never a "party" to the lawsuit brought by Digimarc and that there were not "any allegations of impropriety" made against Viisage in that lawsuit were false because Digimarc was in fact added as a defendant to that lawsuit on or about November 3, 2003 and there were allegations made against Viisage relating to its improper conduct in that bidding process.

33.    On August 11, 2004, defendants filed Viisage's Form 10-Q for the quarter ended June 30, 2004. In that Form 10-Q, defendants stated under Item 4 - Controls And Procedures:

> (a) Evaluation of disclosure controls and procedures. Our management, with the participation of our Chief Executive Officer, or CEO, and Chief Financial officer, or CFO, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of June 27, 2004.
>
> * * *
>
> Based on this evaluation, our CEO and CFO concluded that, as of June 27, 2004, our disclosure controls and procedures were (1) designed to ensure that material information relating to us, including our consolidated subsidiaries, is made known to our CEO and CFO by others within those entities, particularly during the period in which this report was being prepared and (2) effective, in that they provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the Securities Exchange Commission's rules and forms.

34.    Defendants' statements regarding Viisage's internal controls were knowingly, or recklessly, materially false and misleading because Viisage's internal

controls were in fact so woefully inadequate that, as admitted at the end of the Class Period, they qualified as being in a state of "material weakness" under Public Company Accounting Oversight Board's Accounting Standard No. 2.

35.    After the close of the market on October 25, 2004, Viisage announced "record" results for the third quarter ended September 30, 2004 -- Viisage's first profitable quarter in three years -- and increased Viisage's revenues and earnings guidance for 2004. Specifically, Viisage stated in a press release:

> Revenues for the third quarter of 2004 totaled $19.91 million, marking the fifth consecutive quarter in which revenues set a Company record, up 97% from $10.11 million in the comparable period last year, as reported in accordance with the change in accounting principle described below. The net income for the third quarter of 2004 was $198,000, or $0.00 on a basic and diluted share basis, compared to a net loss of $389,000, or $0.02 per basic and diluted share, for the third quarter of 2003.
>
> * * *
>
> On the basis of its results for the nine months, Viisage is increasing its guidance for 2004, with annual revenue now anticipated to be between $66-68 million, increased from $60-63 million, and EBITDA anticipated to be between $11.5-12.5 million, increased from EBITDA of $11-12 million.

Viisage did not alter its prior projection that it would report a loss of $1.5 million for the year.

36.    In that press release, Defendant Bailey also stated that "The Company's performance for the third quarter, combined with our accomplishments so far this quarter, give us the confidence to increase both our revenue and EBITDA guidance for 2004." Defendant Aulet added that

> Viisage continued to significantly improve its financial performance and strengthen its balance sheet in the past quarter while maintaining the necessary financial flexibility. Our strong revenue performance coupled with careful expense management enabled us to produce our first profitable quarter on a GAAP basis in several years. At the same time, our

focus on growing EBITDA (earnings before interest, taxes, depreciation and amortization) proved successful as it increased to $3.4 million this past quarter, from $1.5 million in the same quarter last year.

37.    On October 26, 2004, defendants held a conference call with analysts, defendants made similar representations regarding Viisage's record revenues and earnings and increased guidance for 2004. In addition, defendant Aulet highlighted the significant benefits achieved from the Company's August 5, 2004 offering and its "record" results for the third quarter stating:

> At the end of the third quarter of 2004 we had a cash position of approximately $37.36m compared to $12.6m at the end of the second quarter, reflecting the addition of net proceeds of approximately $37.9m from our follow-on offering, offset by the initial repayment of related party debt of approximately $10m. Of our cash position only approximately $3m or less than 10 percent is encumbered.

> As Bernard mentioned, we're pleased to announce as well today that we have received a commitment letter from a major bank for a $25m line of credit to replace our existing bank facilities. This new arrangement will not only give us valuable flexibility but will also reduce our rates of borrowing, significantly simplify our covenants, and increase yields on our money in the bank, all while making our G&A operations more productive by providing services locally and worldwide to meet our rapidly evolving needs.

> In the fourth quarter we will be able, if we so choose, to reduce our outstanding debt quite significantly, and after paying off early prepayment fees save approximately $600,000 a year in interest expense. We will be monitoring this closely, and our actions will be affected directly by our M&A program. But in any case, we have new financial flexibility that will be very valuable to support our growth, as well as being highly cost effective.

38.    On November 10, 2004, Viisage filed its Form 10Q for the third quarter ended September 30, 2004. In that Form 10Q, defendants repeated the revenue and earnings figures discussed in ¶¶ 35-37. In addition, Viisage again stated under Item 4 - Controls And Procedures:

> (a) Evaluation of disclosure controls and procedures. Our management, with the participation of our Chief Executive Officer, or CEO, and Chief Financial officer, or CFO, evaluated the effectiveness of our disclosure

12

controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act) as of September 26, 2004.

* * *

Based on this evaluation, our CEO and CFO concluded that, as of September 26, 2004, our disclosure controls and procedures were (1) designed to ensure that material information relating to us, including our consolidated subsidiaries, is made known to our CEO and CFO by others within those entities, particularly during the period in which this report was being prepared and (2) effective, in that they provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the Securities Exchange Commission's rules and forms.

39.    Defendants' statements at ¶¶ 35-38 concerning Viisage's reported revenues and earnings for the third quarter and the increased guidance for 2004 were materially false and misleading because defendants knowingly or recklessly engaged in improper and premature recognition of revenues as evidenced in part by the 39% increase in day sales outstanding ("DSO") for its receivables -- from 58.5 days at the end of the quarter ended June 30, 2004 to 81.4 days at the end of the quarter ended September 30, 2004. This rapid and dramatic increase in DSOs is a strong indicator that receivables were improperly and/or prematurely recorded thereby artificially inflating revenues. In addition, given Viisage's woefully inadequate internal controls, Defendants' statements regarding Viisage's reported revenues, earnings, and internal controls were knowingly, or recklessly, materially false and misleading.

40.    On December 22, 2004, the Georgia Court in which Digimarc's lawsuit was pending found "that there were significant instances of misconduct and misrepresentations by Defendant Viisage." As a result, the Georgia Court disallowed the $2 million in payments Viisage claimed it was owed for services it purportedly performed under the contract.

41.    On December 27, 2004, Viisage issued a press release regarding the Georgia court's ruling in the Digimarc lawsuit. Attempting to put a positive spin on that

ruling, Defendants omitted any information concerning the Georgia Court's finding of Viisage's misconduct, Defendant Bailey stated:

> Viisage learned today that the Georgia court has issued a summary judgment ruling permitting the state to move forward in its rebid of the state's drivers' license contract and permitting Viisage to compete to retain its contract with the state. We are pleased that the state will finally be permitted to begin the rebid process and *that the judge has agreed with us and the state on virtually all aspects of the summary judgment motions*.

42.    In addition, Viisage admitted without explanation that the court had ruled that $2 million of the purported $2.5 million settlement Georgia discussed in above could not be paid to Viisage.

43.    Defendant Bailey's statement that the Georgia court "agreed" with Viisage "on virtually all aspects of the summary judgment" was knowingly, or recklessly, materially false and misleading because it omitted information concerning the Georgia Court's findings of Viisage's misconduct and misrepresentations in the bidding process. In addition, defendants knowingly, or recklessly, failed to disclose that the court's ruling would require Viisage to write-down $2 million in assets that Viisage had recorded on its books for the settlement.

44.    In spite of defendants' attempt to put a positive spin on the Georgia Court's ruling -- and omit material information regarding Viisage's improper conduct with respect to that contract -- as this news seeped into the market during the holidays, Viisage's stock price began to immediately decline following this announcement -- from a Class Period high of $9.64 per share on December 23, 2004 (the previous trading day) to a low of $8.38 on December 27, 2004, or a 15% drop, closing at $8.82 on high volume.

45.    On February 7, 2005, defendants announced that Viisage would meet defendants' previously stated revenue guidance for 2004 and report $66-$67 million in revenues for 2004. However, the Company also stated that it would not meet its previously issued earnings guidance of $11.5 - $12.5 million in EBITA and report only

between $8-$9 million in EBITA. In addition, rather than report a $1.5 loss as previously projected, Viisage anticipated a loss of approximately $7-8 million. The Company claimed that the earnings shortfall was "primarily due to several non-recurring factors, including a non-cash impairment charge of $2 million in connection" with the Digimarc litigation relating to the Georgia DMVS contract. Defendants also specifically blamed a tax election taken in the fourth quarter but which was related to it acquisition of TDT on February 14, 2004 i.e. the first quarter of 2004. Further, defendants blamed "Sarbanes-Oxley Section 404 Compliance" claiming that "despite work undertaken in prior quarters, Viisage experienced higher than anticipated costs related to its Sarbanes-Oxley compliance efforts" totaling $550,000 in the fourth quarter.

46.     That day defendants Bailey and Aulet held a conference call with analysts in which they attempted to downplay the significance of the earnings shortfall and, at the same time, highlight defendants' claim that Viisage had met its revenue guidance for 2004. Describing the shortfall as a series of one time events, Defendant Bailey stated:

> To better help you understand the shortfall, let me provide you some color that will allow you to take some comfort in knowing that this short fall is, in most cases, due to a series of nonrecurring events that do not undermine the long-term fundamentals of our business model. This shortfall can be primarily attributed to three primary buckets -- first, timing of revenues; second, currency translations; and, third, compliance, legal, and other acquisition-integration-related expenses.

47.     Indeed, defendant Bailey claimed that fourth quarter revenues would have been even higher had not certain contracts "slipped" from that quarter and was expected to be realized over the first two quarters of 2005." Defendant Bailey also discussed the $2 million asset write down due to the court's December 22, 2004 ruling in the Digimarc litigation, stating:

> I think many of you saw our press release on the conclusion of this legal matter last month. We have now had the opportunity to assess the situation more thoroughly in light of the most recent judge's decision to reduce our compensation-related to terminating our contract with the State of

Georgia, and we were able to discuss with our lawyers and our auditors what prudent measures we should take. As a result, we are taking a one-time, noncash, $2m write-down during the fourth quarter of 2004 for an impairment charge to assets currently on our balance sheet. This, we believe, is taking an appropriately conservative approach to the situation. As you'll recall, the December summary judgment ruling, in essence, sent the dispute in contract back to the Department of Motor Vehicle Safety in Georgia for a rebid -- exactly what we had asked for.

48.    The market's reaction was immediate. On February 8, 2005, Viisage's shares plunged as much as 24.3% -- from $7.27 to a low of $5.85 -- on extraordinarily high volume of over 4.6 million shares.

49.    Nonetheless, Defendants' statements regarding Viisage's reported revenues for 2004 and expected revenues in the first/second quarters of 2005 in ¶¶45-47 were knowingly, or recklessly, materially false and misleading because defendant had improperly and prematurely recognized revenue in the fourth quarter ended December 31, 2004 as evidenced in part by the fact that accounts receivable day sales outstanding remained at 81 days.  In addition, given Viisage's still woefully inadequate internal controls, Defendants' statements regarding Viisage's reported revenues and earnings were knowingly, or recklessly, materially false and misleading.

50.    On March 2, 2005, defendants again shocked the market announcing that a "material weakness" existed in Viisage's internal accounting controls. Thus, Viisage's auditor, BDO Seidman LLP, would "issue an adverse opinion with respect to the effectiveness of the Company's internal controls over financial reporting." In addition, Viisage announced that revenues for the first quarter 2005 would be between $15-$17 million -- well below expectations of $19.7-$21 million.

51.    The market's reaction to these latest revelations was again immediate. On March 3, 2005, Viisage's shares plunged as much as 27.2% -- from the close of $5.47 the previous day to a low of $4.30 on March 3, 2005 on extraordinarily high volume of over 6.2 million shares.

16

## FALSE FINANCIAL
## <u>REPORTING DURING THE CLASS PERIOD</u>

52.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

a.    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

b.    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

c.    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

d.    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

e.    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and

creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

        f.     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

        g.     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

        h.     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

     53.    Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

54.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and materially misleading herein relate to then-existing facts and conditions. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying the important then-present factors that could and did cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Genuity who knew that those statements were false when made. Any warnings contained in the press releases and the financial statements quoted herein were generic statements of the kind of risks that affect any high profile company and misleadingly contained no specific factual disclosure of any of the looming problems with Genuity which placed Genuity's profitability and growth at risk.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants

55.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

56.    Throughout the Class Period, defendants Viisage, Bailey, Aulet, Berube, Beck, Levine and Reilly, individually and in concert, directly and indirectly, by the use

and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company, including its true state of operations and financial health, as specified herein.

57.    The defendants employed devices, schemes, and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about the Company not misleading; and engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the members of the Class in an effort to maintain artificially high market prices for Viisage shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

58.    The Viisage Press Releases and SEC filings referenced in above were each materially false and misleading for the reasons stated above .

59.    In addition to the duties of full disclosure imposed on the defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, these defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in Regulation S-X, S-K, Form F-3 and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

60.    Defendants Bailey, Aulet,, Berube, Beck, Levine and Reilly, as the directors and/or top executive officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as

20

officers and/or directors of the Company and/or members of the Audit Committee, and/or through their extensive stock ownership in Viisage, the Individual Defendants were able to and did control the content of the false and misleading public statements disseminated by the Company described herein. With knowledge of the falsity and/or misleading nature of the statements contained therein or in reckless disregard of the true operations and finances of the Company, the Individual Defendants caused the heretofore complained of public statements to contain misstatements and omissions of material facts as alleged herein. The false and misleading statements contained in the Company's SEC filings and press releases constituted "group published information," which the Individual Defendants were responsible for creating.

## Defendants Acted with the Requisite State of Mind

61.    The defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were readily available to them based upon the following facts.

62.    With respect to the misrepresentations concerning the Georgia Department of Motor Vehicle Safety, the litigation was identified in the SEC filings signed by each of the defendants. Although concealed by Viisage, Viisage was added as a defendant to that lawsuit on or about November 3, 2003 and there were allegations made against Viisage relating to its improper conduct in that bidding process, as detailed above. Given the significance of this business to Viisage -- a $20 million contract -- and the fact that the litigation had been continuing since 2003 and escalating during the Class Period, and that Viisage's conduct was a principal subject of the litigation, each defendant either knew that Viisage had improper communications with the Georgia Department of Motor Vehicle Safety during the bidding process, had made misrepresentations to the Georgia Department of Motor Vehicle Safety concerning, *inter alia*, Viisage's ability to provide

21

back-up facilities to them. Further, due to these improprieties by Viisage in the bidding process, there was no basis for Viisage's public assertions that it had secured $2 million in settlement funds from the Georgia Department of Motor Vehicle Safety, which it expected to be paid in the thirds quarter. As acknowledged in its 10Q for Q3, the Georgia Court presiding over the case had issued a preliminary injunction prohibiting any such payment. Moreover, in late December, the Georgia Court, based upon an extensive evidentiary record of Viisage's malfeasance entered a final judgment prohibiting the payment based on findings that, *in 2002*, Viisage and certain state employees had inappropriate and unauthorized communications after the price proposals were discussed and that Viisage had engaged in "significant instances of misconduct and misrepresentations", including its claim to have a backup card production facility.

63.    Defendants' misrepresentations concerning the true circumstances of its conduct in the bidding process enabled Viisage to complete, in August 2004, the secondary offering of approximately 7.5 million shares by which it sold approximately 7.3 million shares and received net proceeds of approximately $37.4 million, Lau, controlled by Defendant Berube, realized proceeds of $779,779.00 from the sale of 141,778 shares, Beck realized proceeds of $779,779 from the sale of 141,778 shares of Viisage common stock, and Odeon, controlled by Defendant Yon, realized proceeds of $743,363.50 from the sale of 135,157 shares of Viisage stock. Significantly, the proceeds of this offering to Viisage were used, in substantial part, to repay in full a $15.3 million promissory note issued to Defendant Beck and to repay in full a $4.3 million debt obligation to Lau. As represented in Viisage's SEC filings, "as a result of their ownership, both Lau and Mr. Beck have a strong influence on matters requiring approval by our stockholders, including the election of directors and most corporate actions, including mergers and acquisitions.

64.    Although the Georgia Court issued its preliminary injunction on September 2, 2004, Viisage concealed that fact until the announcement of its third quarter

results on October 25, 2004 -- after it had completed its acquisition of Imaging Automation, Inc. on or about October 5, 2004. Viisage utilized 3.9 million shares of its common stock for 77 percent of the $34 million purchase price.

65.    In addition, as of the end of the third quarter, Viisage had incurred indebtedness to Commerce Bank and Trust Company in the amount of $8,384,000. The financial covenants in effect at the time, which had been recently renegotiated, included, *inter alia*, that Viisage **not** report a net loss for 2004 greater than $2.0 million. Through the first two quarters of 2004, however, Viisage had reported a net loss of $1,949,000 -- or a mere $51,000 away from violating the covenant. Each defendant therefore knew that it was essential for Viisage to report a profit in the third quarter. Viisage, however, had not reported a profitable quarter in three years.

66.    In addition to $2,302,921.50 in proceeds from sales on the secondary offering, the Individual Defendants reaped proceeds from open market sales of Viisage stock, in the aggregate, of $8,990,315.02, as follows:

a.    Lau, controlled by Defendant Berube sold the following shares of Viisage:

| NAME | DATE | SHARES SOLD | PROCEEDS |
|---|---|---|---|
| Lau Acq. Corp. | 11/30/2004 | 50,000 | $394,882.50 |
| Lau Acq. Corp. | 12/1/2004 | 25,000 | $200,000.00 |
| Lau Acq. Corp. | 12/2/2004 | 75,000 | $604,000.00 |
| Lau Acq. Corp. | 12/7/2004 | 100,000 | $839,000.00 |
| Lau Acq. Corp. | 12/13/2004 | 77,000 | $645,480.00 |
| Lau Acq. Corp. | 12/15/2004 | 25,000 | $206,250.00 |
| **TOTALS** | | 352,000 | $2,889,612.50 |

b.    Odeon, controlled by Defendant Yon, sold the following shares of

Viisage:

| NAME | DATE | SHARES SOLD | PROCEEDS |
|------|------|-------------|----------|
| Odeon | 11/2/2004 | 16,649 | $122,037.17 |
| Odeon | 11/3/2004 | 21,860 | $159,796.60 |
| Odeon | 11/4/2004 | 19,000 | $137,940.00 |
| Odeon | 11/5/2004 | 26,000 | $190,840.00 |
| Odeon | 11/8/2004 | 23,025 | $168,082.50 |
| Odeon | 11/9/2004 | 15,769 | $112,117.59 |
| Odeon | 11/10/2004 | 11,000 | $77,770.00 |
| Odeon | 11/16/2004 | 2,000 | $14,140.00 |
| Odeon | 11/30/2004 | 61,764 | $508,397.40 |
| Odeon | 12/01/2004 | 183,300 | $1,470,066.00 |
| Odeon | 12/02/2004 | 105,190 | $846,779.50 |
| Odeon | 12/08/2004 | 81,507 | $661,836.84 |
| Odeon | 12/09/2004 | 20,409 | $163,476.09 |
| Odeon | 12/13/2004 | 21,000 | $176,400.00 |
| Odeon | 12/14/2004 | 162,000 | $1,341,360.00 |
| **TOTALS** | | 770,473 | $6,029,002.52 |

c.    During the Class Period, Defendant Levine sold 9,000 shares of

Viisage common stock during the Class Period and realized proceeds of $63,000.

d.    During the Class Period, Defendant Reilly sold 10,000 shares of

Viisage common stock during the Class Period and realized proceeds of $8,700.

67.     With respect to the $900,000 tax asset established in the fourth quarter, the acquisition of TDT took place on February 14, 2004. Defendants therefore knew or recklessly disregarded prior to the beginning of the Class Period, that it would be taking the election to treat the acquisition of TDT as an asset transaction for tax purposes. Had this election been taken in the third quarter, Viisage would have been in violation of its recently agreed to loan covenant.

68.     No significant event occurred during the third or fourth quarter that could have led to a massive deterioration in the Company's internal controls as of year-end 2004 that were identified by Viisage on March 2, 2004. Defendants therefore knew or recklessly disregarded that their representation in the 10Q for the second and third quarters as to the adequacy of those financial controls was false and lacked any reasonable basis. Defendants Levine and Reilly as two of the three members of Viisage's Audit Committee were specifically charged with responsibility for Viisage's internal controls and therefore knew of their gross inadequacy or acted in reckless disregard of that fact.

69.     As a result of these deceptive practices and false and misleading statements and/or omissions, the market price of Viisage shares was artificially inflated during the Class Period. In ignorance of the false and misleading nature of the representations and/or omissions described above and the deceptive and manipulative devices employed by the defendants, Plaintiff and the other members of the Class, in reliance on either the integrity of the market or directly on the statements and reports of the defendants named in this Count, purchased Viisage shares at artificially inflated

prices.

70.     Had Plaintiff and the other members of the Class known of the material adverse information not disclosed by the defendants named in this Count, or been aware of the truth behind these defendants' material misstatements, they would not have purchased or acquired Viisage shares, or, if they had purchased or acquired such shares, they would not have done so at the artificially inflated prices which they paid.

71.     As a direct and proximate result of the wrongful conduct by the defendants named in this Count, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Viisage shares.

72.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20 of the Exchange Act Against Defendants Bailey, Aulet, Berube, Beck and Yon

73.     Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

20.     Each of the defendants named in this Court were control persons of the Company by virtue of their positions as directors and/or as senior officers and/or control over a controlling block of stock, of the Company, and acted as a controlling person of the Company within the meaning of Section 20 of the Exchange Act during the Class Period.

21.     Defendant Bailey had the power and authority to cause the Company to engage in the wrongful conduct complained of herein, by virtue of his position as Chief Executive Officer, a Director of the Board and his substantial ownership position.

Defendant Berube also had the power and authority to cause the Company to engage in the wrongful conduct complained of herein, by virtue of his position as Chairman of the Board, and Lau's substantial ownership position. Defendant Beck also had the power and authority to cause the Company to engage in the wrongful conduct complained of herein, by virtue of his position as Vice Chairman of the Board, and his substantial ownership position. Viisage has admitted that "as a result of their ownership, both Lau and Mr. Beck have a strong influence on matters requiring approval by our stockholders, including the election of directors and most corporate actions, including mergers and acquisitions." Defendant Yon also had the power and authority to cause the Company to engage in the wrongful conduct complained of herein, by virtue of his position as a member of the Board and Odeon's substantial ownership position. Likewise, defendant Aulet as the Chief Financial Officer of the Company had the power and authority to cause the Company to engage in the wrongful conduct complained of herein. They were each in a position to control or influence the contents of, or otherwise cause corrective disclosures to have been made in the Company's SEC filings, along with the Company's other public statements that contained materially false and misleading statements that were disseminated during the Class Period.

22.    By reason of the wrongful conduct alleged herein, the defendants named in this Court are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Viisage shares during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, pray for relief and judgment, as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

C.    Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

D.    Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:    March 14, 2005

Jeffrey C. Block, Esq.  (BBO# 6007470
Leslie R. Stern, Esq. (BBO# 631201)
BERMAN DEVALERIO PEASE
    TABACCO BURT & PUCILLO
One Liberty Square, 8th Floor
Boston, MA 02109
(617) 542-8300

Jeffrey A. Klafter, Esq.
KLAFTER & OLSEN LLP
1311 Mamaroneck Ave., Suite 220
White Plains, NY 10605
(914) 997-5656

Kurt B. Olsen, Esq.
KLAFTER & OLSEN LLP
2121 K Street, N.W.
Suite 800
Washington, D.C. 20037
(202) 261-3553

Brian M. Felgoise, Esq.
LAW OFFICE OF BRIAN M. FELGOISE, P.C.
261 Old York Road, Suite 423
P.O. Box 706
Jenkintown, PA 19046
(215) 886-1900

**Attorneys for Plaintiff**

MAR 15 2001 4:58PM HP LASERJET 3200
Mar 15 05 04:25p
Case 1:05-cv-10498-MLW Document 1-2     Filed 03/16/2005     Page 9 of 9
p.2
000  00-0000
p.3

**EXHIBIT**

## CERTIFICATION OF NAMED PLAINTIFF UNDER
## THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995

I, John Flynn, declare as follows with respect to claims under the federal securities laws alleged in the Complaint:

1.     I seek to join as one of the plaintiffs named in the foregoing complaint ("the Complaint").

2.     I have reviewed the Complaint and have authorized my joinder.

3.     I did not purchase stock in Viisage Technology, Inc. ("VISG") at the direction of my counsel or in order to participate in any private securities action.

4.     I am willing to serve as a representative party on behalf of the class, including providing testimony at depositions and trial, if necessary.

5.     The following sets forth all of my transactions during the class period in VISG stock:

| PURCHASE OR SALE | NO. OF SHARES | PRICE PER SHARE | DATE |
|---|---|---|---|
| PURCHASE | 2,000 | 7.10 | 2/2/2005 |

6.     The following sets forth all federal securities actions filed during the past three years in which I have served or sought to serve as a representative party on behalf of a class:

7.     I will not accept any payment for serving as a representative party on behalf of the class beyond my pro rata share of any recovery to the class, plus reasonable costs and expenses (including lost wages) directly relating to the representation of the class, except as approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

3/9/05
Date

Signature

Name:    John Flynn
Address:    30 CANYON ACRES DR.
City/State:    Santa Barbara, CA 93105
Country:    USA

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

1. Title of case (name of first party on each side only)___Flynn v. Viisage Technolgy, Inc.___

2005 MAR 16  A 11: 24

_____

U.S. DISTRICT COURT
DISTRICT OF MASS.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

|  | I. | 160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT. |
|--|----|--|
| ✓ | II. | 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950. |
|  | III. | 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891. |
|  | IV. | 220, 422, 423, 430, 460, 480, 490, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900. |
|  | V. | 150, 152, 153. |

*Also complete AO 120 or AO 121 for patent, trademark or copyright cases

05   10498 MLW

3. Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.
    Darquea v. Viisage Technology, Inc, 1:05-cv-10438

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
                                                                 YES ☐   NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28 USC §2403)
                                                                 YES ☐   NO ☑

    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
                                                                 YES ☐   NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
                                                                 YES ☑   NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
                                                                 YES ☑   NO ☐

    A.   If yes, in which division do all of the non-governmental parties reside?

    Eastern Division ☑        Central Division ☐        Western Division ☐

    B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

    Eastern Division ☐        Central Division ☐        Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)
                                                                 YES ☐   NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME    Jeffrey C. Block
ADDRESS    Berman DeValerio Pease Tabacco Burt & Pucillo, One Liberty Sq., Boston, MA 02109
TELEPHONE NO.    (617) 542-8300

(CategoryForm.wpd - 2/15/05)

# CIVIL COVER SHEET

%JS 44 (Rev. 11/04)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

John Flynn

**DEFENDANTS**

Viisage Tech., Inc., Bernard Bailey, William Aulet, Denis Berube, Buddy Beck, Marcel Yon, Thomas Reilly & Charles Levine

**(b)** County of Residence of First Listed Plaintiff  Santa Barbara Cty., CA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Middlesex County
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Jeffrey C. Block, Berman DeValerio Pease Tabacco Burt & Pucillo
1 Liberty Sq., Boston, MA 02109 (617)542-8300

Attorneys (If Known)

05-10498-MLW

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | **PERSONAL INJURY** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | ☐ 362 Personal Injury - Med. Malpractice | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 365 Personal Injury - Product Liability | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | **PERSONAL PROPERTY** | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 370 Other Fraud | | | |
| ☐ 245 Tort Product Liability | ☐ 371 Truth in Lending | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 380 Other Personal Property Damage | | | |
| **CIVIL RIGHTS** | ☐ 385 Property Damage Product Liability | | | |
| ☐ 441 Voting | **PRISONER PETITIONS** | | | |
| ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 443 Housing/ Accommodations | **Habeas Corpus:** | | | |
| ☐ 444 Welfare | ☐ 530 General | | | |
| ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | | | |
| ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other | | | |
| ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | |
| | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
§§ 10 (b) ans 20 (a) of the Securities Exchange Act of 1934 & Rule 10b-5

Brief description of cause:
Plaintiffs bring this action as a class action for violation of the federal securities laws.

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):  JUDGE  Mark L. Wolf   DOCKET NUMBER  1:05-cv-10438-MLW

DATE
03/16/2005

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____